IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20552,

*Plaintiff*,

               v.

Fair Collections & Outsourcing, Inc.
12304 Baltimore Avenue, Suite E
Beltsville, MD 20705
(Prince George's County)

Fair Collections & Outsourcing of New
England, Inc.
12304 Baltimore Avenue, Suite E
Beltsville, MD 20705
(Prince George's County),

FCO Worldwide, Inc.
12304 Baltimore Avenue, Suite E
Beltsville, MD 20705
(Prince George's County),

FCO Holding, Inc.
12304 Baltimore Avenue, Suite E
Beltsville, MD 20705
(Prince George's County), and

Michael E. Sobota
806 Riverside Drive
Ormond Beach, FL 32176,

*Defendants*.

Complaint for a Civil Case

Civil Action No.

      The Bureau of Consumer Financial Protection (Bureau) brings this action against

Fair Collections & Outsourcing, Inc., Fair Collections & Outsourcing of New England,

Inc., FCO Worldwide, Inc., FCO Holding, Inc. (collectively FCO or the FCO entities), and

Michael E. Sobota, FCO's chief executive officer, president, director, and owner, and alleges as follows:

## INTRODUCTION

1.      FCO and Sobota operate the largest debt-collection company in the multi-unit-housing industry, and they collect debt on behalf of large apartment complexes, including student and military housing, and assisted-living facilities.

2.      FCO routinely furnishes information to consumer-reporting agencies (CRAs) but has failed to maintain reasonable policies and procedures regarding the accuracy and integrity of the information it furnishes, including the handling of consumer disputes, as required by federal law.

3.      FCO has failed to conduct reasonable investigations of certain consumer disputes and has failed to cease furnishing information that was alleged to have been the result of identity theft before it made any determination of whether the information was accurate.

4.      In addition, FCO and Sobota have collected debt without a reasonable basis to assert it was owed.

5.      The Bureau brings this action based on Defendants' violations of § 1036(a)(1)(A) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a)(1)(A); § 623 of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2; § 1022.42 of Regulation V, 12 C.F.R. § 1022.42; and § 807 of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692e.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), by an agency of the United States, 28 U.S.C. § 1345, and presents a federal question, 28 U.S.C. § 1331.

7.      Venue is proper in this district because Defendants are located, reside, or do business in this district. 12 U.S.C. § 5564(f).

## THE PARTIES

8.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under "Federal consumer financial law," 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce these laws. 12 U.S.C. § 5564(a), (b).

9.      Defendant Fair Collections & Outsourcing, Inc. (FCO, Inc.) is a Maryland corporation with its principal place of business at 12304 Baltimore Avenue, Suite E, Beltsville, MD 20705. FCO, Inc. collects debt on behalf of multi-unit-housing developments and furnishes information about consumers to CRAs. At all times material to this Complaint, FCO, Inc. has transacted business in this district.

10.     Defendant Fair Collections & Outsourcing of New England, Inc. (FCO NE) is a Maryland corporation with its principal place of business at 12304 Baltimore Avenue, Suite E, Beltsville, MD 20705. FCO NE collects debt on behalf of multi-unit-housing developments and furnishes information about consumers to CRAs. At all times material to this Complaint, FCO NE has transacted business in this district.

11.     Defendant FCO Worldwide, Inc. (FCO WW) is a Maryland corporation with its principal place of business at 12304 Baltimore Avenue, Beltsville, MD 20705. FCO WW collects debt on behalf of multi-unit-housing developments and

furnishes information about consumers to CRAs. FCO WW also operates a call center in Makati City, Philippines. At all times material to this Complaint, FCO WW has transacted business in this district.

12.     Defendant FCO Holding, Inc. (FCO Holding) is a Maryland corporation with its principal place of business at 12304 Baltimore Avenue, Suite E, Beltsville, MD 20705. FCO Holding collects debt on behalf of multi-unit-housing developments and furnishes information about consumers to CRAs through its wholly-owned subsidiaries FCO, Inc., FCO NE, and FCO WW. At all times material to this Complaint, FCO Holding has transacted business in this district.

13.     FCO, Inc., FCO NE, FCO WW, and FCO Holding are under common control and operate out of a combined headquarters. The entities commingle funds and share common employees, common officers, common ownership, and strategic leadership such that they constitute a single business enterprise.

14.     FCO, Inc., FCO NE, FCO WW, and FCO Holding operate under the business names of "Fair Collections & Outsourcing" and "FCO" and share a common website: www.fco.com. In oral and written communications to consumers, the entities hold themselves out as "Fair Collections & Outsourcing" and "FCO."

15.     Defendant Michael E. Sobota is the 100% owner of FCO Holding, which, in turn, owns 100% of FCO, Inc., FCO NE, and FCO WW. He is an officer and director of various FCO entities, including the chief executive officer, the president, and a director of FCO Holding, FCO NE, and FCO, Inc.

16.     At all times material to this Complaint, Sobota has had unilateral managerial responsibility, financial control, and ultimate decision-making authority for FCO. He has also materially participated in the conduct of FCO's affairs. According to

FCO, Sobota is responsible for "determining, implementing, and ensuring" FCO's policies and procedures, including FCO's Manual. At all times material to this Complaint, Sobota has transacted business in this district.

17.     At all times material to this Complaint, FCO has furnished consumer-account information to CRAs. The consumer-account information FCO has collected and provided is used or expected to be used in connection with a decision regarding the offering or provision of a consumer-financial product or service and furnishing this information is a service offered or provided for use by consumers primarily for personal, family, or household purposes. This activity is a consumer-financial product or service under the CFPA. 12 U.S.C. § 5481(5), (15)(A)(ix).

18.     At all times material to this Complaint, FCO, Inc., FCO NE, FCO WW, and FCO Holding have been "covered persons" under the CFPA because they engage in offering or providing a consumer-financial product or service. 12 U.S.C. § 5481(5), (6), (15)(A)(ix).

19.     At all times material to this Complaint, FCO Holding has been a "related person," and therefore a "covered person," under the CFPA. 12 U.S.C. § 5481(25)(C)(i).

20.     At all times material to this Complaint, FCO, Inc., FCO NE, FCO WW, and FCO Holding have been "persons" under the FCRA. 15 U.S.C. § 1681a(b).

21.     At all times material to this complaint, FCO, Inc., FCO NE, FCO WW, and FCO Holding have regularly furnished information relating to consumers to CRAs for inclusion in consumer reports. Therefore, they have been "furnishers" under Regulation V. 12 C.F.R. § 1022.41(c).

22.     At all times material to this Complaint, all Defendants have been "debt collectors" under the FDCPA because they have regularly collected or attempted to

collect, directly or indirectly, debts owed or due or asserted to be owed to another or have used an instrumentality of interstate commerce or the mails in a business the principal purpose of which is collecting debts. 15 U.S.C. § 1692a(6).

COMMON ENTERPRISE

23.     At all times material to this Complaint, FCO, Inc., FCO NE, FCO WW, and FCO Holding have operated as a common enterprise that shares common ownership, management, address, office space, and employees, and commingles funds.

24.     FCO, Inc., FCO NE, FCO WW, and FCO Holding have operated as a common enterprise while engaging in unlawful conduct, including the violations of law described herein.

25.     Because FCO, Inc., FCO NE, FCO WW, and FCO Holding have operated as a common enterprise, each of them is jointly and severally liable for the acts or practices alleged.

FACTUAL BACKGROUND

FCO's Handling of Indirect Disputes

26.     FCO furnishes information about debt collection accounts to CRAs, including the nationwide CRAs Equifax, Experian, and TransUnion (NCRAs), and is currently furnishing information about approximately 500,000 accounts.

27.     The FCRA allows consumers to dispute furnished information with a CRA (referred to as an "indirect dispute") or directly with a furnisher (referred to as a "direct dispute").

28.     FCO receives indirect disputes through the Online Solution for Complete and Accurate Reporting ("E-OSCAR"). E-OSCAR is a web-based system developed by

the NCRAs for processing Automated Credit Dispute Verifications, which refers to the form that accompanies a consumer's indirect dispute.

29.     When a consumer submits an indirect dispute about a debt furnished by FCO to one of the NCRAs, it is routed to FCO through E-OSCAR. Any supporting documentation submitted by the consumer to the NCRA with the dispute is also sent to FCO through E-OSCAR. In addition, the NCRAs assign a code to each dispute, reflecting the subject matter of the dispute.

30.     Upon receipt, FCO generally has 30 days to conduct a reasonable investigation of a dispute, as required by FCRA § 623(b)(1), and to submit a response through E-OSCAR that the disputed information should be deleted, modified, or verified as being accurate as reported.

31.     If FCO does not respond to an indirect dispute within 30 days, FCRA § 611(a)(5)(A) requires that the CRA promptly delete the disputed information from the disputing consumer's file or modify the item, as appropriate, based on the results of the CRA's own investigation. As a result, if FCO does not timely respond to an indirect dispute concerning information it furnished about a consumer, the disputed information may be deleted from the consumer's credit file by the CRA.

32.     FCO receives and responds to about 10,000 indirect disputes each month.

33.     At all times material to this Complaint, FCO has assigned all indirect disputes to be handled on a centralized basis by several employees in its call center in

Makati City, Philippines.  The employees are ostensibly supervised by FCO's compliance manager, who works in Maryland.

34.     In 2016 and 2017, four employees in FCO's call center were primarily responsible for responding to all of the indirect disputes that FCO received.

35.     FCO has provided limited to no affirmative training to its employees about how to conduct reasonable investigations of indirect disputes.  While employees have been permitted to ask questions of FCO's compliance manager, if they asked no questions, they have received limited guidance.

36.     FCO has not provided employees any training on the requirements of the FCRA as they relate to the handling of indirect disputes.

37.     FCO has not monitored the pace at which employees respond to the NCRAs concerning indirect disputes,  except to ensure that FCO has responded to all indirect disputes within the time period prescribed by the FCRA, so that the disputed information would not be deleted from consumers' credit reports by a CRA.

38.     FCO employees have resolved indirect disputes at a fast pace that generally allowed for only a limited review. For example, from August 2017 to November 2017, FCO employees resolved indirect disputes at an average rate of about 17 disputes per hour, assuming that they did nothing but resolve disputes in an 8-hour day.

39.     Some employees have resolved indirect disputes far more quickly than others. For example, Employee A was assigned to review all indirect disputes with supporting documentation submitted by consumers, which are about one third of the total indirect disputes FCO receives each month. Employee A maintained the fastest pace of all employees, resolving about 22 disputes an hour on average from August 2017

to November 2017, assuming she did nothing but resolve disputes in an 8-hour day. On one day in September 2017, Employee A resolved indirect disputes with supporting documentation at a rate of 33 disputes an hour.

40.     During the calendar year 2017, FCO employees purported to verify disputed information as being accurate in response to indirect disputes at a rate of 92.2%.

### FCO's Policies and Procedures Regarding Indirect Disputes

41.     For at least seven years, FCO provided limited written guidance to the employees who responded to indirect disputes. From November 2010 through at least December 2017, FCO provided its employees with a document it called the "E-OSCAR Manual" or "Manual," which provided limited instructions on how to respond to certain categories of disputes. During that time, the Manual was FCO's only written policy and procedure regarding the handling of indirect disputes.

42.     The Manual was drafted by FCO's compliance manager and authorized by Sobota, who is the only person with authority to change FCO's policies and procedures.

43.     The Manual provided limited instructions for responding to certain types of indirect disputes.

44.     For example, if a dispute is associated with an account that has been paid, the Manual does not instruct employees to conduct an inquiry into the substance or nature of the dispute. Instead, the Manual instructs employees to verify the information as accurate based on the fact that the account has been paid and the disputing consumer's Social Security number matches the information in FCO's account database.

45.     For disputes relating to an account that a consumer alleges is the result of identity theft or fraud, or that the consumer otherwise alleges does not belong to him or

her, the Manual instructs employees to verify the disputed information as accurate if the disputing consumer's Social Security number and name match the information in FCO's account database. The Manual does not instruct employees to conduct a further inquiry that considers the substantive information provided in a consumer's dispute.

46.     For many other types of disputes, the Manual provides no guidance.

47.     The Manual does not instruct employees to review and consider the supporting documentation, if any, submitted by consumers and transmitted to FCO by the NCRAs through E-OSCAR, before responding to an indirect dispute.

48.     The Manual contains a vague and general statement that "each dispute is different and should be viewed on its own merit," but the Manual does not provide instructions on determining which disputes have merit and which do not.

49.      The Manual contains another vague statement that employees should "confirm other information as accurate on the dispute," but the Manual does not explain what that instruction requires employees to do.  When read in context, the instruction appears limited to confirming a consumer's basic identifying information against the information in FCO's account database regardless of the nature or substance of the dispute.

50.     The Manual does not require employees to save or record any of the information from the E-OSCAR system, including supporting documentation submitted by consumers, into FCO's account database. As a result, FCO cannot reliably determine whether a dispute is identical or related to one it previously received or otherwise review the dispute history on an account.

51.     In establishing the Manual in 2010, FCO did not consider and incorporate appropriate guidelines from Appendix E of Regulation V, 12 C.F.R. Part 1022, which is the implementing regulation for the FCRA. Specifically, FCO did not:

    a.  establish and implement policies reasonably designed to promote the objective of conducting reasonable investigations of consumer disputes and taking appropriate actions based on the outcome of such investigations;

    b.  address the following specific, appropriate components in developing its policies and procedures:

        i.  establishing and implementing appropriate internal controls regarding the accuracy and integrity of information about consumers furnished to consumer reporting agencies, such as by implementing standard procedures and verifying random samples of information provided to consumer reporting agencies;

        ii.  training staff that participates in activities related to the furnishing of information about consumers to consumer reporting agencies to implement the policies and procedures;

        iii.  conducting reasonable investigations of disputes;

        iv.  conducting a periodic evaluation of its own practices, consumer reporting agency practices of which the furnisher is aware, investigations of disputed information, means of communication, and other factors that may affect the accuracy and integrity of information furnished to consumer reporting agencies; and

    c.  identify practices or activities that can compromise the accuracy or integrity of information furnished, such as by:

        i.  reviewing FCO's historical records relating to accuracy or integrity or to disputes;

        ii.  considering the types of errors, omissions, or other problems that may have affected the accuracy or integrity of information FCO has furnished; and

        iii.  considering feedback received from consumer reporting agencies, consumers, or FCO staff.

### For at Least Seven Years, FCO Did Not Review or Update the Manual to Ensure its Effectiveness

52.    Between November 2010 and at least December 2017, FCO did not revise the Manual, while continuing to distribute the Manual to its employees as guidance for how to do their jobs.

53.    Between November 2010 and at least December 2017, FCO did not seek to determine whether the instructions in the Manual were effective in leading employees to conduct reasonable investigations of indirect disputes. Specifically, FCO did not audit the work of its dispute-handling employees to determine whether they were following the policy and, if so, whether that resulted in reasonable investigations of disputes. More generally, FCO did not audit the work of its employees to determine whether they were complying with the FCRA.

54.    FCO did not update the Manual in response to two instances of major technical changes to E-OSCAR in 2013 and 2016 that significantly changed the process

of responding to indirect disputes. Instead, FCO continued to distribute the out-of-date Manual to employees to instruct them on how to do their jobs.

55.     Between November 2010 and at least December 2017, FCO also failed to update its policies and procedures despite its knowledge that indirect disputes were not being appropriately investigated. Instead, FCO turned a blind eye to problems.

56.     For example, FCO received multiple consumer complaints and threats of lawsuits from 2008 through at least 2014 regarding indirect disputes handled by Employee A. After each instance, FCO's compliance manager determined that Employee A had purported to verify as accurate information that was clearly inaccurate on its face.

57.     In addition, FCO knew that its dispute-handling employees were not consistently reviewing the supporting documentation that accompanied certain indirect disputes.

58.     Despite this knowledge, FCO made no changes to its policies and procedures regarding investigations of indirect disputes for at least seven years. Instead, FCO continued to assign its employees a high workload with little supervision or guidance. FCO did not further supervise or check the work of Employee A despite knowing that she was repeatedly verifying false information.

59.     In establishing and implementing its policies and procedures, FCO did not consider feedback from consumers including, but not limited to, the consumers who threatened to sue FCO because their disputes were not investigated.

60.     In establishing and implementing its policies and procedures, FCO also failed to consider and incorporate feedback received from at least one NCRA. In 2017, FCO received an inquiry from that NCRA about FCO's indirect dispute response trends. The NCRA observed that FCO had a high rate of verification in response to indirect

disputes as compared to peer furnishers and asked FCO to review its indirect dispute handling policies and procedures to determine whether it was verifying information that should have been modified or deleted.

61.    FCO did not comply with the NCRA's request and, instead, responded to the NCRA with a misleading description of the thoroughness of FCO's dispute investigations. Specifically, an FCO manager told the NCRA that FCO obtains original supporting documentation before taking on any new debt and that FCO reviews such original documents before responding to indirect disputes.

**FCO Has Failed to Conduct Reasonable<br>Investigations of Indirect Disputes**

62.    When responding to indirect disputes, FCO employees generally apply the limited instructions in the Manual.

63.    In numerous instances, when responding to indirect disputes, FCO employees have only made a threshold determination that an account was paid. FCO employees have conducted no investigation of the substance of such disputes before purporting to verify the disputed information as accurate.

64.    In numerous instances, when responding to indirect disputes alleging identity theft, FCO employees have only confirmed that the disputing consumer's Social Security number matched what was in FCO's files before purporting to verify the disputed information as accurate.

65.    In other instances of disputes alleging identity theft, FCO employees have only checked the disputing consumer's Social Security number and name, or other unspecified identifying information before purporting to verify the disputed information as accurate.

66.     These circular inquiries in response to identity theft allegations merely confirm the same information that FCO furnished in the first place. FCO employees have conducted no further investigation of the disputes before purporting to verify the disputed information as accurate.

67.     In numerous instances, when responding to indirect disputes alleging identity theft, FCO employees have sent consumers blank identity theft affidavits for completion. FCO has made the receipt of such an affidavit a prerequisite to conducting more than a cursory investigation of a consumer's identity theft dispute. In some instances, FCO employees have conducted no further investigation of the consumers' disputes before purporting to verify the disputed information as accurate.

68.     In numerous instances, when responding to indirect disputes that had an E-OSCAR code reflecting that the consumer disputed the account as "not his/hers" and that were accompanied by supporting documentation from consumers, FCO employees have not reviewed or considered the supporting documentation before purporting to verify the disputed information as accurate.

69.     In numerous instances, FCO employees have only checked whether the disputing consumer's Social Security number matched what was in FCO's account files when the question of whether the Social Security number matched was not relevant or responsive to the subject matter of the consumer's disputes. In these instances, FCO employees conducted no further investigation of the consumers' disputes before purporting to verify the disputed information as accurate.

70.     In numerous instances, with respect to disputes alleging identity theft or fraud or other circumstances under which a reasonable investigation of the dispute required review of original supporting documentation, FCO employees have purported

to verify disputed information as accurate without obtaining or reviewing such original supporting documentation.

71.     In numerous instances, FCO employees do not appear to have reviewed FCO's account files before verifying information as accurate in response to an indirect dispute. For example, employees have noted that a letter accompanying the consumer's dispute in E-OSCAR was the same as one that FCO had previously received, and subsequently conducted no investigation of the dispute before purporting to verify the disputed information as accurate. But FCO's account files show that FCO had not previously received a letter from that consumer.

### FCO Has Continued Furnishing Disputed Information After Consumers Sent Identity Theft Reports

72.     In addition to the indirect dispute process discussed above, consumers can dispute debts by contacting FCO directly.

73.     In numerous instances, consumers have sent FCO police reports or other official reports filed by consumers with a federal, state, or law enforcement agency that have subjected the consumers to criminal penalties for the filing of false information. In those reports, consumers have alleged that their FCO accounts were the result of identity theft or fraud. Those documents are "identity theft reports" under FCRA § 603(q)(4) and 12 C.F.R. 1022.3(i).

74.     FCO has received identity theft reports from consumers via mail at FCO's regular address for consumer correspondence, or via email or facsimile at the instruction of FCO employees.

75.     In numerous instances, FCO has continued to furnish information concerning such FCO accounts before or without determining that the account was not

the result of identity theft or fraud and, therefore, without knowing that the information is correct. At most, FCO employees have noted that the account was disputed, if it had not previously been disputed.

### FCO Has Collected Debts in Portfolios With High Rates of Dispute and Cancellation Without Substantiating the Debts

76.      When a consumer indicates that he or she disputes a debt, FCO employees are instructed to indicate that the account is disputed. But because FCO does not reasonably investigate many indirect disputes, FCO does not determine whether much of the disputed information is accurate or verifiable.

77.      Certain portfolios of debt have been disputed by consumers at rates that are relatively high compared to the average dispute rate on the portfolios of debt that FCO collects.

78.      For the relatively few disputes that FCO does investigate, FCO may seek additional information from clients. In numerous instances, clients have informed FCO that they could provide no documentation to support certain debts. For certain portfolios, the apartment building has been sold and the client is no longer in possession of the supporting documentation for any of the debts associated with that building. In other instances, clients have repeatedly failed to produce documents if and when FCO requests them.

79.      For certain portfolios, the relatively high rates of consumer disputes and inability to obtain additional information are warning signs that put FCO on notice that there may be problems with the accuracy or reliability of the information about the debts in those portfolios.

80.      When collecting on certain portfolios of debt that contained warning signs

as discussed above, FCO has not obtained or reviewed additional information that would provide a reasonable basis to continue to assert that the active debts in the portfolio are owed.

81.    Nonetheless, FCO has made the same express and implied representations to consumers that the debts were owed when collecting on portfolios of debt with warning signs as has done for all other portfolios—namely, that FCO had a reasonable basis for asserting that the debts were owed.

**ROLE OF INDIVIDUAL DEFENDANT MICHAEL E. SOBOTA**

82.    Sobota is the 100% owner of FCO Holding, which, in turn, owns 100% of FCO, Inc., FCO NE, and FCO WW. He is an officer and director of various FCO entities, including the chief executive officer, the president, and a director of FCO Holding, FCO NE, and FCO, Inc.

83.    At all times material to this Complaint, acting alone or in concert with others, Sobota has formulated, directed, controlled, or participated FCO's acts and practices, including the acts and practices set forth in this Complaint.

84.    Sobota has ultimate authority and exercised unilateral managerial control over FCO's policies, procedures, and strategic decisions, including with respect to the collection of debt and the handling of consumer disputes.

85.    According to FCO, Sobota is responsible for "determining, implementing, and ensuring" FCO's policies and procedures, including FCO's Manual.

86.    Sobota is the only person with authority to change FCO's policies and procedures.

87.    As FCO's sole shareholder, CEO, and president, Sobota has unilateral financial control over FCO and has received personal financial gain from the illegal

practices discussed herein.

## THE FAIR CREDIT REPORTING ACT AND REGULATION V

## COUNT I

### (FCO's violations of Regulation V)

88.     The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

89.     The Furnisher Rule, Part E of Regulation V, requires in 12 C.F.R. § 1022.42 that a furnisher of consumer information:

a.     establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnishes to a consumer reporting agency, which must be appropriate to the nature, size, complexity, and scope of the furnisher's activities;

b.     consider and incorporate the appropriate guidelines set forth in Appendix E of 12 C.F.R. Part 1022 in developing such policies and procedures; and

c.     review such policies and procedures periodically and update them as necessary to ensure their continued effectiveness.

90.     FCO has failed to establish or implement reasonable written policies and procedures regarding the accuracy and integrity of the information FCO furnished to consumer reporting companies, specifically with respect to FCO's handling of indirect disputes. Instead, FCO's Manual, which was authorized by Sobota, directed employees to conduct perfunctory and inadequate investigations of indirect disputes and is not appropriate to the nature, size, complexity, or scope of FCO's furnishing activities.

91.     FCO has failed to consider or incorporate the appropriate guidelines set forth in Appendix E of 12 C.F.R. Part 1022 in developing its policies and procedures regarding the handling of indirect disputes.

92.     For at least seven years, FCO failed to review its indirect dispute handling policies and procedures and update them as necessary to ensure their continued effectiveness. Instead, despite knowing that its policies and procedures were outdated and ineffective, FCO continued to distribute the same policies and procedures to employees as guidance for how to do their jobs.

93.     Therefore, FCO has violated 12 C.F.R. § 1022.42.

## COUNT II

### (FCO's violations of the CFPA based on its violations of Regulation V)

94.     The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

95.     The CFPA defines "Federal consumer financial law" to include most provisions of the Fair Credit Reporting Act and to include its implementing regulation, Regulation V.  12 U.S.C. § 5481(12)(F), (14).

96.     The FCO entities are "covered persons" under the CFPA.  12 U.S.C. § 5481(6).

97.     Under the CFPA, a covered person's violation of a Federal consumer financial law, which includes enumerated consumer laws and rules thereunder, violates the CFPA.  12 U.S.C. §§ 5536(a)(1)(A), 5481(14).

98.     FCO's violations of Regulation V, described in Count I, constitute violations of § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT III

### (FCO's violations of FCRA § 623(b)(1))

99.     The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

100.    Under § 623(b)(1) of the FCRA, when a furnisher of information to a CRA receives a notice of dispute regarding the completeness or accuracy of the reported information from a CRA in accordance with the provisions of § 611(a)(2) of the FCRA, the furnisher is required to conduct a reasonable investigation and review all relevant information provided by the CRA. The furnisher must then report the results of the investigation to the CRA.

101.    In numerous instances, FCO has not conducted a reasonable investigation, or any investigation, when it has received a notice of dispute from a CRA under the provisions of § 611(a)(2) of the FCRA.

102.    In addition, in numerous instances, FCO has not reviewed all relevant information provided by the CRA when it has received a notice of dispute from a CRA under the provisions of § 611(a)(2) of the FCRA.

103.    Therefore, FCO has violated § 623(b)(1) of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

## COUNT IV

### (FCO's violations of the CFPA based on its violations of FCRA § 623(b)(1))

104.   The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

105.   The CFPA defines "Federal consumer financial law" to include most provisions of the Fair Credit Reporting Act and to include its implementing regulation, Regulation V.  12 U.S.C. § 5481(12)(F), (14).

106.   The FCO entities are "covered persons" under the CFPA.  12 U.S.C. § 5481(6).

107.   Under the CFPA, a covered person's violation of a Federal consumer financial law, which includes enumerated consumer laws and rules thereunder, violates the CFPA.  12 U.S.C. §§ 5536(a)(1)(A), 5481(14).

108.   FCO's violations of FCRA § 623(b)(1), described in Count III, constitute violations of § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT V

### (FCO's violations of FCRA § 623(a)(6)(B))

109.   The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

110.   Section 623(a)(6)(B) of the FCRA specifies that a furnisher, upon receipt of an "identity theft report" sent to the address specified by the furnisher for receiving such reports, "may not furnish such information that purports to relate to the consumer to any consumer reporting agency, unless the furnisher subsequently knows or is informed by the consumer that the information is correct."

111.    In numerous instances, FCO has received identity theft reports from consumers relating to account information furnished by FCO. FCO has continued furnishing information about those accounts before or without conducting an investigation into the accuracy of the information FCO was furnishing. Instead, FCO has only marked the accounts as disputed.  As a result, FCO has furnished such information without knowing whether it was correct.

112.    Therefore, FCO has violated § 623(a)(6)(B) of the FCRA, 15 U.S.C. § 1681s-2(a)(6)(B).

## COUNT VI

### (FCO's violations of the CFPA based on their violations of FCRA § 623(a)(6)(B))

113.    The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

114.    The CFPA defines "Federal consumer financial law" to include most provisions of the Fair Credit Reporting Act and to include its implementing regulation, Regulation V.  12 U.S.C. § 5481(12)(F), (14).

115.    The FCO entities are "covered persons" under the CFPA.  12 U.S.C. § 5481(6).

116.    Under the CFPA, a covered person's violation of a Federal consumer financial law, which includes enumerated consumer laws and rules thereunder, violates the CFPA.  12 U.S.C. §§ 5536(a)(1)(A), 5481(14).

117.    FCO's violations of FCRA § 623(a)(6)(B), described in Count V, constitute violations of § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## FAIR DEBT COLLECTION PRACTICES ACT

## COUNT VII

## (All Defendants' violations of FDCPA § 807)

118.   The Bureau incorporates by reference the allegations contained in Paragraphs 1-87 of this Complaint.

119.   Sections 807 and 807(10) of the FDCPA, 15 U.S.C. § 1692e, e(10), prohibit debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.

120.   In numerous instances, in connection with the collection of debts, Defendants, directly or indirectly, expressly or by implication, have represented that they have a reasonable basis to assert that consumers owed certain debts.

121.   In truth and in fact, in numerous instances, the representations set forth in paragraph 120 were false, deceptive, or misleading at the time the representations were made because Defendants did not have a reasonable basis to assert that the consumers owed those debts, based on their past course of dealing with specific portfolios of debts. For example, warning signs such as a high rate of consumer disputes and an inability to obtain documentation for the portfolio when attempting to resolve disputes have indicated that certain portfolios had widespread problems such as unreliable or missing data or debts that otherwise could not be substantiated. Nonetheless, Defendants have continued to represent that consumers owed the claimed amounts on existing and new debts in the portfolios without obtaining or reviewing additional information that would provide a reasonable basis for such claims.

122.    In doing so, Defendants have used false, deceptive, or misleading representations or means to collect or attempt to collect any debt, in violation of §§ 807 and 807(10) of the FDCPA, 15 U.S.C. § 1692e, 1692e(10).

123.    Therefore, Defendants have violated §§ 807 and 807(10) of the FDCPA, 15 U.S.C. § 1692e, § 1692e(10).

## PRAYER FOR RELIEF

WHEREFORE, the Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

    a.   permanently enjoin Defendants from committing future violations of the FCRA, Regulation V, the FDCPA, and the CFPA, and enter such other injunctive relief as appropriate;

    b.   impose civil money penalties against Defendants;

    c.   award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, FCRA, Regulation V, and FDCPA, including but not limited to refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

    d.   order Defendants to pay the Bureau's costs incurred in connection with proceeding with this action; and

    e.   award additional relief as the Court may determine to be just and proper.

Dated: September 25, 2019

Respectfully submitted,

CARA M. PETERSEN
*Acting Enforcement Director*
DAVID M. RUBENSTEIN
*Deputy Enforcement Director*
THOMAS KIM
*Assistant Deputy Enforcement Director*

    /s/   Jessica Rank Divine
Jessica Rank Divine (District of Maryland Bar
No. 810852; New York Bar No. 4544573)
Carl L. Moore (District of Maryland Bar No.
811325; Maryland Attorney No. 0912160268)
*Enforcement Attorneys*
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Telephone (Divine): 202-435-7863
Telephone (Moore): 202-435-9107
Fax: 202-435-7722
jessica.divine@cfpb.gov
carl.moore@cfpb.gov

*Attorneys for the Bureau of Consumer
Financial Protection*